*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

In re SCHAEFER, Minors.

UNPUBLISHED
November 4, 2021

No. 356332
Arenac Circuit Court
Family Division
LC No. 17-013769-NA

Before: MARKEY, P.J., and BECKERING and BOONSTRA, JJ.

PER CURIAM.

Respondent-mother appeals as of right the order terminating her parental rights to DS and RS[1] pursuant to MCL 712A.19b(3)(c)(*i*) (failure to rectify conditions of adjudication), (c)(*ii*) (failure to rectify other conditions), (g) (failure to provide proper care or custody), and (j) (reasonable likelihood of harm if returned to parent). On appeal, respondent argues that the trial court erred by finding that the agency provided reasonable efforts to reunify her with the children, that clear and convincing evidence existed to terminate her parental rights, and that termination was in children's best interests. We disagree.

## I. FACTUAL BACKGROUND

Both DS and RS are special-needs children. DS was diagnosed with post-traumatic stress disorder (PTSD) and had emotional and social developmental concerns. RS was born with Down Syndrome and had significant medical concerns, including issues with proper feeding. The Department of Health and Human Services (DHHS) filed an initial petition for their removal on December 18, 2017, after respondent's husband, PS, was arrested for assaulting her eldest son, MA.[2] The petition stated that PS was abusive and respondent failed to protect MA by failing to call police, leave the house, or take MA to a doctor. The petition also stated that respondent had missed multiple medical appointments for RS, even though RS was rushed to the hospital while unresponsive several months earlier. The petition stated that respondent had no transportation and reported that she and PS did not have money to buy necessities, such as diapers, although they

---

[1] The children's father voluntarily released his parental rights and he is not a party to this appeal.

[2] MA turned 18 during the proceedings and was dismissed from the case.

bought frivolous items for themselves. The petition also stated that respondent had not shown that she could stabilize her own mental health. The trial court authorized the petition and the children were placed into foster care. PS was incarcerated for his assault against MA.

During the course of the initial review hearings, respondent slowly began to improve. She found employment and obtained her own apartment. The children did well in foster care, but RS required special feeding therapy in Traverse City because of his medical issues. Respondent lived more than an hour and a half away from Traverse City and struggled to obtain transportation to attend services. She missed multiple medical and therapy appointments for RS. Without consistent instruction on feeding techniques, she was not allowed to feed RS and she could therefore not progress to unsupervised visits. On May 23, 2019, the foster care worker submitted a petition to terminate respondent's parental rights. The foster care worker argued that respondent failed to benefit from services; did not consistently attend scheduled appointments for the children's medical services, relationship counseling, or her own mental health; did not participate or ask questions at the sessions she did attend; and did not show a benefit from parenting classes. The petition also alleged that respondent continually tested positive for marijuana, but the foster care worker admitted that respondent had a valid medical marijuana card.

The trial court held a hearing regarding the petition on July 12, 2019, and petitioner agreed to withdraw the petition because respondent had not been offered adequate services to give her a chance to overcome the barriers to reunification. Specifically, the trial court ordered DHHS to find feeding therapy for RS that was closer to respondent so she could attend and learn the necessary feeding skills. The court also ordered respondent to address her issues with domestic violence, transportation, and mental health and show that she could be responsible for a high-needs child.

At subsequent hearings, the agency described its struggles to find feeding therapy services for RS that were closer to respondent. Although the agency found a closer service, it was delayed multiple times because RS was put on a waitlist, RS needed GI surgery, and the facility shut down during the COVID-19 pandemic. Meanwhile, the agency asked the children's foster mother to attend parenting times to show respondent the proper feeding techniques for RS. The trial court expressed continued frustration that the agency was unable to arrange therapy services in which both RS and respondent could participate. However, when RS was eventually accepted into a closer program, he had regressed so much that respondent agreed to transfer him back to services in Traverse City. RS was also accepted into a six-week inpatient intensive feeding program in Grand Rapids and put on a waitlist. Meanwhile, respondent maintained her housing and employment, but continued to miss appointments for both herself and the children.

DHHS filed a second termination petition on December 28, 2020. At the second termination hearing, respondent's foster care worker and two foster care case aides testified that they were concerned about respondent's parenting abilities. They testified that she disregarded strategies she was taught in parenting classes and became frustrated during visits. Respondent struggled to follow through with discipline with DS and did not redirect DS's unsatisfactory behaviors and emotional outbursts. She also struggled to change RS and frequently forgot the safe-feeding techniques that RS needed. She would not listen to caseworker suggestions and commented that she was only participating in parenting classes because her foster care worker required her to do so. One worker testified that she saw respondent leave RS in a stroller without

a brake on and allowed the stroller to roll away, let the children to wander into the parking lot, and was often distracted by her other child. RS's feeding therapist testified that respondent participated in 13 of 43 feeding therapy sessions, and while she was there, she did not appear to be paying attention, and she did not ask questions. The trial court found that clear and convincing evidence supported terminating respondent's parental rights pursuant to MCL 712A.19b(3)(c)(*i*), (*ii*), (g), and (j) and that termination was in the children's best interests. Respondent now appeals.

## II. ANALYSIS

### A. REASONABLE EFFORTS

Respondent first argues that the trial court erred by finding that DHHS made reasonable efforts toward reunification. We disagree.

In a case involving the termination of parental rights, "[t]his Court reviews the trial court's findings under the clearly-erroneous standard." *In re Ellis*, 294 Mich App 30, 33; 817 NW2d 111 (2011). See also MCR 3.977(K). "A finding is clearly erroneous if, although there is evidence to support it, this Court is left with a definite and firm conviction that a mistake has been made." *Id*. "Further, regard is to be given to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it." *Id*.

Except in cases of aggravated circumstances under MCL 712A.19a(2), DHHS must make reasonable efforts to reunify a child with his or her parents before a court may order termination of parental rights. *In re Hicks/Brown*, 500 Mich 79, 85; 893 NW2d 637 (2017). Failure to provide services aimed at reunification can render the termination of the parent's parental rights premature. *In re Mason*, 486 Mich 142, 152; 782 NW2d 747 (2010). Although the agency has the duty to provide reasonable services, it is not obligated to provide every possible service. *In re Terry*, 240 Mich App 14, 27-28; 610 NW2d 563 (2000). In addition, the parent has a commensurate duty to cooperate with and participate in the services offered and benefit from those services. *In re TK*, 306 Mich App 698, 711; 859 NW2d 208 (2014).

In this case, although the trial court expressed frustration with the agency's attempts to provide services to respondent, the record shows that the agency provided reasonable services aimed at reunification. The agency struggled to find feeding therapy services that would both benefit RS and be accessible to respondent, but clearly made efforts to do so. The agency arranged transportation for respondent to Traverse City until a local treatment could be found. The agency found a closer service, but it had a waitlist, so in the meantime the agency arranged for RS's foster mother to tutor respondent in proper feeding technique. Because of circumstances outside of the agency's control, the local therapy services were unsuccessful. The COVID-19 pandemic restricted respondent's access to the therapy sessions, unpredicted medical issues and extensive waitlists delayed RS's therapy, and even after RS was admitted, it was insufficient for RS's needs and respondent agreed to send him back to Traverse City. Otherwise, DHHS provided a multitude of services aimed at reunification, including infant mental health services, food assistance, Medicaid assistance, supervised parenting visits, family team meetings, referrals to Michigan Works, medical transportation assistance, bus tokens, gas cards, housing assistance, mental health referrals, referrals to domestic violence programs, multiple referrals to parenting classes based on respondent's specific needs, home public health services, and text reminders for respondent about

her appointments. Therefore, DHHS made reasonable efforts toward reunification. Further, respondent cannot show that any additional services would have changed the outcome of the proceedings because the record shows that when respondent did participate in feeding therapy services, she did not benefit from them. Respondent did not engage in appointments and did not ask questions, and when she did participate in feeding, she did not follow the safe-feeding procedures she had learned and would often need reminders. As a result, the record demonstrates that respondent failed to adequately benefit from the services that were offered, and she does not explain how additional services would have made a difference in the outcome of the case. Accordingly, we conclude that the trial court did not err by finding that the agency made reasonable efforts toward reunification. See *id*. at 711-712.

## B. STATUTORY BASIS

Respondent next argues that the trial court erred by finding that at least one statutory ground for termination was proven by clear and convincing evidence. We disagree.

In this case, the trial court terminated respondent's parental rights pursuant to MCL 712A.19b(3)(c)(*i*), (c)(*ii*), (g), and (j). Because we conclude that the trial court did not clearly err as to subsection (j) we need not address the other subsections. *In re HRC*, 286 Mich App 444, 461; 781 NW2d 105 (2009).

MCL 712A.19b(3)(c)(j) provides that termination is appropriate when "[t]here is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent." Although the trial court recognized that respondent would not intentionally harm her children, both children had special needs that required considerable time and effort to attend to safely. RS required extensive medical care, including at least two weekly feeding therapy appointments in Traverse City, multiple surgeries, an upcoming inpatient treatment in Grand Rapids, doctor appointments, and behavioral therapy. Respondent struggled to attend those appointments because of the distance, transportation issues, her full-time employment, and her own difficulty remembering appointments. There were also several concerns that respondent did not pay attention during the appointments, did not ask questions, and did not develop the skills necessary to safely feed RS. Therefore, respondent showed that she could not keep up with RS's extensive needs, so there was a reasonable likelihood that RS would be harmed if returned to respondent's care.

Regarding DS, although the risk of harm is not as obvious, we have recognized that either physical or emotional harm is sufficient to support termination under MCL 712A.19b(3)(j). *In re Hudson*, 294 Mich App 261, 268; 817 NW2d 115 (2011). DS had several social and emotional developmental concerns, had difficult interacting appropriately with adults and peers, struggled with PTSD and dysregulation, and was aggressive. DS had an individual education plan and participated in weekly sessions with a special educator and therapist. DS's therapist testified that if DS were to be reunified with respondent, respondent would need training and education about trauma and would need to continue her own treatment. However, respondent sporadically participated in her own mental health treatment and RS's appointments, so there is no indication that she would continue DS's treatment. Respondent did not appear to benefit from other parenting classes, including trauma-informed parenting classes and one class that was specifically designed

-4-

to help her redirect DS's behavior. Respondent's parenting time with DS showed that she could not manage DS's special needs. Respondent's foster care worker repeatedly reported that respondent disregarded the training she received in parenting classes, continually failed to redirect DS's unsatisfactory behavior, and failed to redirect DS's trauma and emotional outbursts. Overall, the record showed that respondent would not be able to handle DS's treatment needs and that reunification posed a reasonable risk of harm to DS's emotional and mental well-being. Moreover, respondent acquired a significant history with Child Protective Services before this case, and the evidence showed that she failed to benefit from over three years of services so that the children could be safely returned to her care. Therefore, the trial court did not err by finding that clear and convincing evidence supported termination pursuant to MCL 712A.19b(3)(j). See *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014) (concluding that the respondent's "failure to benefit from her service plan and the likelihood that her behavior would put her children at a risk of harm" supported termination pursuant to MCL 712A.19b(3)(j)).

## C. BEST INTERESTS

Respondent also asserts that the trial court erred by finding that termination was in the children's best interests. We disagree.

Termination of parental rights is appropriate when the trial court determines that one or more grounds for termination are supported by clear and convincing evidence and that termination is in the child's best interests. *In re LaFrance Minors*, 306 Mich App 713, 732-733; 858 NW2d 143 (2014). "Best interests are determined on the basis of the preponderance of the evidence." *Id.* at 733. When determining the best interests of the child, this Court focuses on the child, rather than the parent. *In re Schadler*, 315 Mich App 406, 411; 890 NW2d 676 (2016). A trial court should weigh all the evidence and consider a variety of factors, including:

> [T]he child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home. The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption. [*In re White*, 303 Mich App at 713-714 (quotation marks and citations omitted).]

A trial court must decide the best interests of each child individually. *In re Olive/Metts*, 297 Mich App 35, 42; 823 NW2d 144 (2012).

In this case, the factors supported the court's findings that termination was in the children's best interests. First, although respondent undoubtedly loved her children, there was no testimony regarding the children's bond with respondent, and the trial court concluded that there was an insufficient bond between respondent and the children. Second, foster care workers and case aides reported consistent concerns with respondent's parenting abilities despite three years of services. Indeed, as of November 2020, respondent acknowledged that she could not properly care for her children. As a result, it was unclear when, if ever, the children could be successfully returned. Next, the children had a high need for permanency and stability, given their special medical, mental, and emotional needs. In fact, RS significantly regressed in his therapy when his services

were interrupted for even a few months. The children had been in foster care for more than three years—the majority of their lives—and respondent never progressed to unsupervised parenting time during the case, despite receiving services. Respondent did not comply with all the requirements of her case service plan because she did not participate in or benefit from all parenting classes, she missed the children's appointments, and she only sporadically attended mental health services. Finally, the children's foster home offered clear benefits. The children were highly bonded with their foster parents and were succeeding in their care. The children's foster mother was able to provide dedicated time and attention to their special needs, including attending the multitude of special medical appointments that RS required, which respondent could not do. Therefore, the trial court did not clearly err by finding that termination was in the children's best interests. See *In re White*, 303 Mich App at 713-714.

Affirmed.


/s/ Jane E. Markey
/s/ Jane M. Beckering
/s/ Mark T. Boonstra